**GLEN III, By and Through His Parent and Guardian Ad Litem, GLEN II, and Glen II, Individually, and June I, Plaintiffs,**

v.

**The CHARLOTTE–MECKLENBURG SCHOOL BOARD OF EDUCATION, Defendant.**

No. 3:94–CV–189–P.

United States District Court, W.D. North Carolina, Charlotte Division.

Sept. 25, 1995.

Edward G. Connette, Lesesne & Connette, Charlotte, NC, A. Frank Johns, Booth, Harrington, Johns & Campbell, Greensboro, NC, for Glen III, By and Through his Parent and Guardian Ad Litem, Glen II, Glen II, Individually, June I.

Jim D. Cooley, Mark P. Henriques, Elizabeth L. Riley, Womble, Carlyle, Sandridge & Rice, Charlotte, NC, for Charlotte–Mecklenburg School Board of Education.

### MEMORANDUM OF DECISION AND ORDER

ROBERT D. POTTER, Senior District Judge.

**THIS MATTER** is before the Court on Defendant's Motion to Dismiss and alternatively for Summary Judgment, filed October 11, 1994 [document # 41]. On November 23, 1994, Plaintiffs filed a Memorandum in Response to Defendant's Motion [document # 48]. On December 14, 1994, Defendant filed a Reply to Plaintiffs' Memorandum in Response to Defendant's Motion [document # 55]. On February 14, 1995, Defendant served counsel for Plaintiffs with Defendant's First Requests for Admissions to Plaintiffs by hand delivery and by U.S. Mail, as well as Interrogatories and Requests for Production of Documents, to all of which the Plaintiffs have failed to respond timely. No extension of time to respond was ever requested by the Plaintiffs or was granted by the Court.

On April 11, 1995, this Court granted a motion to extend the discovery deadline to July 12, 1995 and motions deadline to August 11, 1995. On June 27, 1995, the Court ordered that each party be allowed to file one brief not later than September 8, 1995 and no reply briefs would be filed. On July 17, 1995, the Plaintiffs filed a Notice of Withdrawal of Motion for Preliminary Injunction. On September 8, 1995, the Defendant filed its Supplemental Memorandum as allowed by the Court. The Plaintiffs did not file any further briefs.

Rule 36 of the Federal Rules of Civil Procedure provides in pertinent part:

. . .

Each matter of which an admission is requested shall be separately set forth. *The matter is admitted* unless, within 30 days after service of the request, or within such shorter or longer time as the court may allow or as the parties may agree to in writing, subject to Rule 29, the party to

whom the request is directed serves upon the party requesting the admission a written answer or objection addressed to the matter, signed by the party or by the party's attorney.... (Emphasis added).

## BACKGROUND

The Plaintiff, Glen III, was a student at McClintock Middle School in Charlotte, Mecklenburg County, North Carolina during the school year 1993–94. He was diagnosed with Attention Deficit Hyperactivity Disorder ("ADHD"). On December 10, 1993, while at school, a report was made to McClintock's principal, Joel Ritchie, that there was a weapon on the school grounds. Glen III was found to be in possession of a gun clip and live bullets and was suspended from school for ten days commencing December 13, 1993. Notice of the suspension was given to Glen III's father. A school-based committee met on Monday, December 13, 1993, the first school day after Glen III was found with the gun clip and live bullets. That committee is a multi-disciplinary group of educators and specialists familiar with Glen III's disability and with his individualized education plan ("IEP"). The purpose of the meeting was to determine whether or not Glen III's possession of a gun clip and bullets was related to his ADHD. The committee determined that "the actions of the student were not related to his disability." Therefore, Glen III was subject to regular disciplinary proceedings.

The Plaintiffs were notified of a hearing to be held on January 3, 1994 in response to the recommendation of Principal Ritchie that Glen III be subjected to External School Suspension ("ESS"). The parents were also notified of their right to attend and participate at the disciplinary hearing on January 3. Prior to the January 3, 1994 meeting, the Plaintiffs were provided the "Handbook on Parents Rights." (Glen II Depo. p. 130, 1. 17–25; p. 131, 1. 1–6).

The hearing was conducted by a court liaison, Bryan Blavatt, the designated hearing officer, at which all the Plaintiffs and their advocate were present. At the request of Glen II, a second hearing was held January 5, 1994; Glen II and his advocate, Robin B. Clarke, both attended. The committee again considered the relationship between Glen III's disability and his behavior on December 10, 1993 and again found there was none and that Glen III was subject to disciplinary proceedings pursuant to Charlotte–Mecklenburg Schools ("CMS") Behavior Guidelines. Blavatt determined that Glen III should be placed on ESS and be assigned to the safety net program at the Management School for a period of sixty days after which he would be re-evaluated for return to his regularly assigned school.

On January 11, 1994, Blavatt, by letter, informed Glen III's parents of the decision; with notice of their right to appeal that decision, with deadlines and procedures for initiating the appeal to the Charlotte–Mecklenburg Board of Education. A written appeal was taken and the Board upheld Blavatt's decision. No petition for a Contested Case Hearing was initiated in this case and Plaintiffs chose not to send Glen III to Management School. Consequently, Glen III did not attend CMS from December 10, 1993 until *February 28, 1995,* when he was enrolled at Eastway Middle School in Charlotte, Mecklenburg County.

The professionals at that school developed an IEP for Glen III, which was signed by members of the IEP team, including Glen II on April 4, 1995. Neither Glen III nor his parents have had any complaints about the IEP or its implementation.

The Plaintiffs had moved for injunctive relief on April 12, 1994 in Mecklenburg County Superior Court. After removal to this Court, Plaintiffs filed a Motion for Mandatory Preliminary Injunction on June 13, 1994 (document # 5). Since Glen III is currently enrolled in the CMSS and is receiving educational services under an IEP which was approved by an IEP team and Glen II, there is no longer any need for injunctive relief and the Court will therefore deny the Motion for injunctive relief as being moot. In any event, on July 17, 1995 the attorney for the Plaintiffs filed a written notice of withdrawal of their motions for temporary injunction and preliminary injunction (document # 69).

## PLEADINGS

The Plaintiffs filed their Complaint in Mecklenburg County Superior Court on April 12, 1994.

The Complaint alleges the following claims for relief:

1. The Plaintiff Glen III was denied his rights to "equality, education, due course of law, and equal protection under Article I, Sections 1, 15, 18, and 19 of the Constitution of North Carolina."

2. The Defendant's failure to provide an adequate alternative educational placement in which Glen III would be appropriately accommodated has created a situation in which Glen III is neglected and dependent solely by the actions of the Defendant in violation of North Carolina's juvenile code that protects against neglect and dependency and exposes the parent to sanction under N.C.G.S. § 7A–561 without providing Glen III with appropriate dispositional alternatives as available under the juvenile code.

3. Violation of N.C.G.S. Chapter 168A, North Carolina's statutory declarations of protection against discrimination and failure to accommodate handicapped persons.

4. Denial of Plaintiffs' rights to due process of law and equal protection under the Fifth and Fourteenth Amendments to the United States Constitution.

5. Federal Statutory Civil Rights under the Civil Rights Act, 42 U.S.C. § 1983.

6. Plaintiffs' rights as guaranteed in the Rehabilitation Act of 1973, § 504, Pub. L93–112, 29 U.S.C. § 794 et. seq. and Rules and Regulations promulgated thereunder at 34 C.F.R. 104, et. seq.

7. Denial of Glen III's accommodation for his disabilities within the environment of McClintock School or the Management School as required in the Americans With Disabilities Act ("ADA"), Section 302(b), 42 U.S.C. § 12182.

The Plaintiffs pray:

(1) for compensatory damages in excess of $10,000.00;

(2) punitive damages;

(3) a preliminary and permanent injunction;

(4) a preliminary injunction that orders the temporary placement of Glen III in an educational setting capable of delivering the kind of individualized educational, emotional, and therapeutic services;

(5) declaratory relief that stays any sanction of the parents for violation of the North Carolina Compulsory Attendance Law; and

(6) costs and attorney's fees.

## FINDINGS OF FACT

1) Plaintiffs, Glen II (the "father") and June I (the "mother"), are the natural parents (the "parents") of Glen III, all residents of Mecklenburg County, North Carolina. Plaintiffs, at all times material hereto, were domiciled and residents of Mecklenburg County, North Carolina. (Complaint, ¶ 3).

2) Plaintiff, Glen III (the "student"), is a 15 year old minor with disabilities. He is represented in this action by Glen II, his father, next friend and guardian ad litem. Glen III is a student resident of, and enrolled in Defendant's school system. As alleged below, Glen III is entitled to protection and benefits of federal and state laws. (Complaint, ¶ 4.)

3) Defendant Charlotte–Mecklenburg Board of Education is a body politic, a local governmental unit created and empowered under the General Statutes of North Carolina to have general control and supervision of all matters pertaining to the public schools in Mecklenburg County, North Carolina. Said Defendant is a "Local Educational Agency" ("LEA") within the meaning of federal and state law. (Complaint, ¶ 5.)

4) On February 14, 1995, Defendant served counsel for Plaintiffs with Defendant's First Requests for Admissions ("DFRFA") to Plaintiffs by hand delivery and U.S. Mail, as well as Interrogatories and Requests for Documents, to which Plaintiffs have failed to

respond.[1] (Defendant's Memorandum in Support of Defendant's Motion for Summary Judgment, filed April 26, 1995.)

5) There was a complaint that Glen III was in possession of a firearm at some time during the school day on December 10, 1993. He was in possession of a gun clip loaded with live bullets while at school on December 10, 1993. (DFRFA # 14 & # 15) (Glen III Depo. 6/6/95, p. 106, 1. 25; p. 107, 1. 1–25; p. 108, 1. 1–2).

6) Glen III was removed from school by Defendant on Friday afternoon, December 10, 1993. (Complaint, ¶ 6).

7) On or about December 10, 1993, June I was orally notified that Glen III had been suspended from school because he was in possession of a gun clip with live bullets. (DFRFA, # 22).

8) On or about December 10, 1993, Glen II was notified that Glen III had been suspended from school because he was in possession of a gun clip with live bullets. (DFRFA, # 23).

9) On or about December 10, 1993, June I was orally notified that during the week of December 13, 1993, school personnel familiar with Glen III would be convened to consider the relationship between Glen III's behavior for which he was being suspended and his ADHD. (DFRFA # 24).

10) Prior to December 10, 1993, Glen II had requested that Principal Joel Ritchie fax information concerning Glen III to Glen II at his place of employment. (DFRFA # 28).

11) At the beginning of the 1993–94 school year, Plaintiffs were provided with copies of Defendant's School Policies, including the Behavior Guidelines for 1993–94, revised September 1993. (DFRFA # 29).

12) The school policy includes a Number 5 offense, designated as a Class III offense and provides:

> The act of knowingly possessing, using or threatening to use any weapon or any instrument which may be capable of inflicting bodily injury. *Note: The principal will request an expulsion for any student possessing or using firearms at school.*

13) If Glen III's possession of a gun clip and bullets on December 10, 1993, was *not* related to a manifestation of his ADHD, Glen III was subject to the disciplinary process applicable to "regular education" students. (DFRFA # 19).

14) Even if Glen III's conduct on December 10, 1993 and disability *are* related, Defendant was entitled to suspend Glen III from school for up to ten days. (DFRFA # 20).

15) On Monday, December 13, 1993, a school based committee, which is a multi-disciplinary group of educators and specialists familiar with Glen III's disability and with his IEP met to consider whether Glen III's behavior in possessing a gun clip and bullets was related to his ADHD. The committee determined that his handicap was not related to his conduct which involved possessing a gun clip with live bullets and possibly possessing a gun. (Complaint, ¶ 10; Joel Ritchie Aff., ¶ 25; Walls Aff., ¶¶ 3–6).

16) Glen II and June I, parents, did not attend the December 13, 1993 meeting. (Ritchie Aff., ¶¶ 22–25).

17) On December 14, 1993, Bryan Blavatt, court liaison for CMS, wrote Glen II advising him of a hearing concerning Principal Joel Ritchie's request that Glen III be placed on External School Suspension (ESS), advising Glen II of his rights at the hearing, pursuant to Student Behavior Guidelines. That letter also advised Glen II that a hearing on principal Joel Ritchie's request that Glen III be suspended for more than 10 days would be held Friday, December 17, 1993 at 1:00 p.m. at McClintock Middle School. (Blavatt Aff., ¶ 3; Glen II Depo., Ex. 6).

18) At Glen II's request, the ESS hearing was rescheduled for January 3, 1994 (Glen II Depo. Ex. 7). Glen II was notified of the new hearing date by letter from Blavatt on December 17, 1993, advising Glen II of his right to representation, his right to question

---

1. All of Defendant's First Requests for Admissions to Plaintiffs, none of which were responded to by Plaintiffs, will be deemed by the Court to be admitted in accordance with Rule 36 of the Federal Rules of Civil Procedure.

witnesses, and his right to present evidence on Glen III's behalf. (Blavatt Aff., ¶ 4).

19) On January 3, 1994, Blavatt presided over a hearing on Principal Joel Ritchie's recommendation that Glen III be placed on ESS. The hearing was attended by Joel Ritchie, assistant principal Curtis Carroll, Glen II, June I, Robin Clarke, an assistant to Robin Clarke, CMS attorney Irving Brenner, and Glen III. Testimony was heard from several witnesses, including the individuals in attendance and Glen III's sister, Stephanie. Glen II, June I, and Glen III and Glen III's advocate, Robin Clarke, were given a full and fair opportunity to participate, and they did participate, in the hearing. (Blavatt Aff., ¶ 5; Glen II Depo. Vol. I, pp. 119–125; Glen II Depo. Ex. 8 & 11).

20) Based on evidence presented at that hearing, Blavatt concluded that Glen III had a clip of live bullets in his possession on the campus of McClintock Middle School on December 10, 1993, and also determined that there was substantial credible evidence that Glen III had possessed a gun at school and was trying to sell the weapon to another student. Glen III denied possession of a gun. (Blavatt Aff., ¶ 6).

21) Possession of bullets in school is a Class III offense under the Charlotte–Mecklenburg Schools Behavior Guidelines ("Guidelines"), in that bullets are instruments capable of inflicting bodily injury and they constitute a clear threat to the safety of other students, employees or persons at the school. Given Blavatt's finding with respect to possession of a clip of live bullets, no determination was made in regard to the possession of a gun, which was not found. (Blavatt Aff., ¶ 7).

22) Based upon the evidence presented at the hearing, and after being informed by the Exceptional Children's Department of its review of the determination of the school-based committee that normal disciplinary procedures were applicable, Blavatt recommended that Glen III be transferred to the safety net program at the Management School. This recommendation was reviewed by the Assistant Superintendent for Student Services, Calvin Wallace. (Blavatt Aff., ¶ 8).

23) On January 11, 1994, Blavatt wrote the parents of Glen III and advised them that the School Service Committee found that Glen III's offense had no direct relationship to Glen III's exceptionality, that Glen III was placed on ESS and that he had the right to remain in his same educational placement for services while at the Management School. The parents were also advised of their due process rights to appeal the suspension decision. The parents did appeal the suspension to the Charlotte–Mecklenburg Board of Education, which upheld the ESS. (Blavatt Aff., ¶ 9; Glen II Depo. Ex. 13, 14, 15).

24) The Charlotte–Mecklenburg Schools developed the Management School in part to provide an environment where children with behavioral difficulties can continue their education and receive behavioral assistance to enable them to return to their regular school assignment. Students are required to enroll in Management School for a minimum of sixty days. After sixty days, students are periodically evaluated for return to their regular school assignment. The Management School consists primarily of students who have been reassigned from their regular school program. (Blavatt Aff., ¶ 10; Glen II Depo. Ex. 16).

25) The Management School provides the standard regular and special educational curriculum offered at a typical CMS middle school. The Management School also offers special behavior management techniques. Students placed at the Management School usually benefit from the small class size and low student-teacher ratio, which is lower than that found at regular CMS middle schools. (Blavatt Aff., ¶ 11; Glen II Depo. Ex. 16).

26) The Management School is equipped to deal with exceptional children. The Management School is fully capable of providing Glen III with the special education and related services he needs. The Management School was ready and able to provide services which comply with Glen III's IEP in January, 1994. (Blavatt Aff., ¶ 12; Glen II Depo. Ex. 16).

27) It was Blavatt's professional opinion that at the time of the placement of Glen III in January, 1994, the Management School

could have appropriately fulfilled Glen III's IEP. (Blavatt Aff., ¶ 13).

28) The Plaintiffs have no new or additional evidence to be presented with regard to the facts surrounding Glen III's possession of a bullet clip on December 10, 1993, beyond that evidence previously presented at the disciplinary hearing in this matter, held January 3, 1994. (DFRFA # 1).

29) The services on Glen III's 1993–94 IEP could be provided at the Management School. (DFRFA # 2). Glen III did not attend because he and his father decided it wouldn't be a good place for him to go. (Glen III Depo. p. 111, 1. 7–16).

30) Glen III was reassigned to and could have attended the Management School for the balance of the 1993–94 school year, subsequent to the disciplinary hearing on January 3, 1994. (DFRFA # 3).

31) Plaintiffs at no time enrolled or otherwise presented Glen III for attendance at the Management School during 1994. (DFRFA # 4).

32) Plaintiffs, as parents of a child with special needs, received from some source copies of their due process rights under federal and state law prior to the 1993–94 school year. (DFRFA # 6).

33) Plaintiffs received notice or were otherwise aware of their right to initiate a contested case hearing through the Office of Administrative Hearings at the time Glen III was reassigned to the Management School in 1994. (DFRFA # 7).

34) Plaintiffs received notice or were otherwise aware of their right to initiate a contested case hearing through the Office of Administrative Hearings at the time CMS determined not to pay tuition for Glen III at the Dore Academy for the 1994–95 school year. (DFRFA # 8).

35) The copy of Gil Middlebrooks' letter of November 22, 1994, attached to the DFRFA as Exhibit 1 is a true copy of the original that Plaintiffs or their counsel received prior to December 9, 1994. (DFRFA # 9).

36) Middlebrooks' letter, as redacted, reads as follows:

November 22, 1994

Mr. Frank A. Johns
Booth Harrington Johns & Campbell
239 North Edgeworth Street
Post Office Box 3585
Greensboro, North Carolina 27402–3585
Re: Glen III
Dear Mr. Johns:

In an earlier conversation, you and I discussed the payment for Glen III's placement at Dore Academy. In our conversation on this subject, I told you that I saw no way in which our client, the Charlotte–Mecklenburg Board of Education, would voluntarily fund a private placement at Dore Academy.

The purpose of this letter is to confirm in writing what I have told you earlier. The Board and its staff do not believe that a private placement is the appropriate educational setting for Glen III in the least restrictive environment. Accordingly, it is denying your client's request for funding of private schooling.

As you know, your client has the right to file a due process petition in the Office of Administrative Hearings to contest this agency action. The statute requires that I inform your client of the procedure for filing a contested case petition. That procedure may be accomplished by obtaining a copy of a blank petition from the Office of Administrative Hearings and then returning the completed contested case petition to that office.

Pursuant to N.C.Gen.Stat. § 150B–23(f), the time limit for filing of a petition in a contested case is 60 days from today's date.

A copy of the *Handbook on Parents' Rights* is enclosed. Please share it with your clients.

    Sincerely,

    James G. Middlebrooks

JGM/jb

Enclosure

cc: Dr. Jane Rhyne (w/o encl.)

37) The Management School provided education and related services to students identified as "ADHD" prior to and during the 1993–94 school year. (DFRFA # 17).

38) The reassignment of Glen III to the Management School as a result of the January 3, 1994 disciplinary hearing was not a change in placement. (DFRFA # 12).

39) The Plaintiffs have admitted they have no evidence that the student population of the Management School in the 1993–94 school year was predominantly composed of dangerous students and/or students who had criminal records. (DFRFA # 18).

40) Plaintiffs agreed to the 1993–94 IEP, which is attached to DFRFA # 25 as Exhibit 2. (DFRFA # 25).

41) None of the Plaintiffs were charged with a violation of North Carolina Juvenile Code during the 1993–94 school year or at any time thereafter. (DFRFA # 26).

42) None of the Plaintiffs were charged with violating the North Carolina Compulsory Attendance law during the 1993–94 school year or at any time thereafter. (DFRFA # 27).

43) Plaintiffs paid no tuition or other expenses for Glen III's education during the spring 1994 semester. (DFRFA # 13).

44) CMS conducted IEP meeting(s) for Glen III for the 1994–95 school year. (DFRFA # 10).

45) All persons Plaintiffs requested to attend the IEP meeting(s) for the 1994–95 school year were present at the meetings. (DFRFA # 11).

46) Plaintiffs did not enroll or otherwise present Glen III for attendance at any CMS school for school year 1994–95. (DFRFA # 5).

47) Plaintiffs have not paid any tuition related to educational services provided to Glen III by the Dore Academy, or other education provider, for the 1994–95 school year. (DFRFA # 16). Glen III was given out of school suspension at Dore Academy on January 19, 1995 and officially withdrawn on January 23, 1995. (Dr. Mary Dore Depo. Ex. 11). Dr. Dore informed Glen II that he tended to make excuses for Glen III's inappropriate behavior. (Dore Depo. p. 39, 1. 5–11; Ex. 10).

48) Plaintiffs received the school board attorney's letter to them of February 17, 1994, which was attached to Plaintiffs' Memorandum in Response to Defendant's Motion for Summary Judgment as Exhibit J. (DFRFA # 32).

49) That letter redacted was as follows:

February 17, 1994

*VIA TELECOPIER AND REGULAR MAIL*

Mr. Frank A. Johns
Booth Harrington Johns & Campbell
239 North Edgeworth Street
Post Office Box 3585
Greensboro, North Carolina 27402–3585

Re: Glen III

Dear Frank:

I am writing in your capacity as attorney for the Glen family and in accordance with our telephone conversation of yesterday.

As you know, I wrote Glen II on January 28, 1994, and informed him of our client's concerns that Glen III had been absent from the Management School since January 11, 1994 and may not be in compliance with the compulsory attendance laws of North Carolina. Neither Glen II nor you have offered an explanation for these absences and, thus, we view them as unexcused.

I would appreciate it if you would convey this information to Glen II and June I. Under N.C.Gen.Stat. § 115C–378, Glen III's parents may be prosecuted in a criminal action for Glen III's absences. The maximum penalty provided by this law upon conviction is 30 days' imprisonment, a fine of $50.00, or both, at the discretion of the judge.

Glen III has been absent from school for more than 10 days. The school system is committed to insuring that all students attend school regularly and comply with the North Carolina Compulsory School Attendance Law. My previous correspondence has made Glen II aware that, as the parent, he has responsibility for his child's attendance.

The school system is committed to working constructively to improve Glen III's attendance and to provide him with the

educational services as described in his IEP. Obviously, we cannot do this if Glen III refuses to attend the Management School.

Unless I hear from you by Tuesday, February 22, 1994, with a satisfactory plan of action for improving Glen III's attendance at the Management School, the school system will follow its procedures for dealing with unexcused absences.

As I explained to you in our telephone conversation of yesterday, I am sorry that we are having to take this step, but it is important that the Glen family comply with the state law regardless of their disputes with the school system.

On a related subject, after speaking with Dr. Rhyne, I have additional information to convey regarding Glen II's letter of February 9, 1994, requesting a due process hearing. Dr. Rhyne informs me that, should your client so desire, the first step would be to hold an APC (administrative placement committee) meeting to review Glen III's current placement. Informal mediation would be the step that CMS routinely suggests, with the filing of a due process petition being a last resort.

With the original of this letter, I am enclosing a copy of the parents' handbook that outlines that due process procedure. Although this is material you know by heart, please send this copy to Glen II and June I, and let me know if they want to ask for an APC meeting. We will not take any action on this issue until I hear from you.

Sincerely,

James G. Middlebrooks

JGM/jb

Enclosure

50) Plaintiffs did not request an Administrative Placement Committee ("APC") meeting in response to the school board attorney's letter to their attorney of February 17, 1994, which was attached to their Memorandum in Response to Defendant's Motion for Summary Judgment as Exhibit J. (DFRFA # 33).

51) Plaintiffs knew of their rights to pursue an administrative appeal of Glen III's suspension under N.C.G.S. § 115C. (DFRFA # 30).

52) Plaintiffs did not pursue an administrative appeal of Glen III's suspension under N.C.G.S. § 115C. (DFRFA # 31).

53) Plaintiffs admit there are no differences between the "accommodation" required under section 504 of the Rehabilitation Act and the "accommodation" required under the Americans With Disabilities Act, as these terms apply to Glen III. (DFRFA # 34).

54) Plaintiffs admit there are no differences between the "accommodation" required under section 504 of the Rehabilitation Act and the "special education and related services" required under the Individuals With Disabilities Education Act, as they relate to Glen III. (DFRFA # 35).

55) Glen III attended Dore Academy at least part of the time he did not attend CMS schools, from August 1994 through approximately January 1995. (Mid.Aff. ¶ 3)[2]. While at Dore Academy he was suspended for misconduct and was withdrawn in January of 1995. (Dore Depo. pp. 36–37). While at Dore Academy Glen II would not cooperate and tended to make excuses for Glen III's inappropriate behavior. (Dore Depo. p. 39, 1. 5–15; Depo. Ex. 10).

56) In November, 1994, CMS received a request from Glen II, Glen III's father, to meet and discuss the services at Eastway and the needs of Glen III. On November 15, 1994, at the request of Glen II, the following persons met at Eastway to review Glen III's needs, the services he was receiving at Dore Academy and the services available at Eastway:

Glen II

Mary Dore, Ph.D.

Barbara Parrish, Counsellor–Technician at Dore Academy

Kim Middleton, Eastway Resource Teacher

Valerie McCullough, CMS Assistant Director of Special Education

**2.** Kim Middleton is a special education resource teacher and served as Exceptional Children's Program Coordinator at Eastway Middle School. This affidavit is part of document # 62.

Phyllis Hampson, Eastway Principal

Barbara Floyd, Eastway Assistant Principal

Angela Pompey, Eastway Resource Teacher

Marcella Rutherford, Self–Contained Exceptional Children's Teacher

Gwen Jackson, Eastway Coordinator of Student Services

Bonnie Kosnikowski, Eastway 9th Grade Counsellor

James G. Middlebrooks, Attorney for CMBE

(Mid.Aff. ¶ 4).

57) Thereafter, Glen II requested that Glen III be re-enrolled in the System. As part of the placement process, CMBE made plans for the review of the agreed-to IEP of Glen III for the 1993–94 school year and the development of an IEP for the present school year. An IEP meeting was scheduled for January 26, 1995, but was cancelled at the request of Glen II. (Mid.Aff. ¶ 5).

58) On February 28, 1995, Glen III enrolled at Eastway Middle School in Charlotte, North Carolina, part of the CMSS (Affidavit of Middleton dated 4/26/95, hereinafter referred to as "Mid.Aff.").

59) The initial IEP scheduled for January 26, 1995 was re-scheduled, by agreement, to take place at Eastway on March 16, 1995, at 3:45 p.m. The following persons were in attendance at the March IEP meeting:

Glen II

June I

Tom Courtney, Eastway Psychologist

Kim Middleton, Eastway Resource Teacher

Valerie McCullough, CMS Assistant Director of Special Education

Phyllis Hampson, Eastway Principal

Barbara Floyd, Eastway Assistant Principal

Angela Pompey, Eastway Resource Teacher

Marcella Rutherford, Self–Contained Exceptional Children's Teacher

Gwen Jackson, Eastway Coordinator of Student Services

Bonnie Kosnikowski, Eastway 9th Grade Counsellor

Tim Freeman, McClintock Middle School Social Studies Teacher

This group of persons, knowledgeable about the history and needs of a student requiring special education services, is also referred to as the "IEP team." A new IEP for Glen III was developed by the IEP team at that meeting. Glen II agreed to the IEP, as developed at the March 16, 1995, meeting. (Mid.Aff. ¶ 6).

60) On April 4, 1995, at 3:45 p.m., a second IEP meeting was held at Eastway to finalize and sign the new IEP. The following persons were in attendance at this meeting:

Glen II

Rich Purcell, Senior Exceptional Children's Specialist

Kim Middleton, Eastway Resource Teacher

Valerie McCullough, CMS Assistant Director of Special Education

Phyllis Hampson, Eastway Principal

Barbara Floyd, Eastway Assistant Principal

Angela Pompey, Eastway Resource Teacher

Marcella Rutherford, Self–Contained Exceptional Children's Teacher

Gwen Jackson, Eastway Coordinator of Student Services

Bonnie Kosnikowski, Eastway 9th Grade Counsellor

Tim Freeman, McClintock Middle School Social Studies Teacher

As a result of the IEP conferences, a new IEP was prepared for Glen III, which was signed by members of the IEP team, including Glen II. A true and correct copy (with Glen III's last name redacted) of the IEP under which Glen III is currently receiving services at Eastway was attached to the affidavit. (Mid.Aff. ¶ 7).

61) The IEP agreed to at the April 4, 1995, meeting is presently being implemented, and all services thereunder are being delivered to Glen III. No complaints have been received from Glen III or his parents regarding the IEP or its implementation. As reflected in the IEP, Glen III is receiving one-on-one instruction in one subject area of concern (math), has a study skills class under Middleton's supervision, receives counseling

and otherwise attends all other regular education classes. Middleton does not believe that additional special education or related services are presently required for Glen III. (Mid.Aff. ¶ 8).

62) On February 14, 1995 when the Plaintiffs were served with DFRA, Glen III was not "faced with immediate potential 'irreparable harm' caused by the Defendant" as set forth in the Preliminary Statement of Plaintiffs' Complaint. (DFRA # 21).

### Defendant's Motion to Dismiss and Motion for Summary Judgment

The Defendant has moved to dismiss and, alternatively, for Summary Judgment. Rule 12(b) of the Federal Rules of Civil Procedure in pertinent part provides:

> (b) How Presented. Every defense, in law or fact, to a claim for relief in any pleading, whether a claim, counterclaim, cross-claim, or third-party claim, shall be asserted in the responsive pleading thereto if one is required, except that the following defenses may at the option of the pleader be made by motion: ... (6) failure to state a claim upon which relief can be granted ...
>
> . . . .
>
> If, on a motion asserting the defense numbered (6) to dismiss for failure of the pleading to state a claim upon which relief can be granted, matters outside the pleading are presented to and not excluded by the court, the motion shall be treated as one for summary judgment and disposed of as required in Rule 56, and all parties shall be given reasonable opportunity to present all material made pertinent to such a motion by Rule 56.

The Court has considered matters outside the pleadings, *i.e.*, depositions, affidavits, Requests for Admissions, etc.

All parties have had more than ample opportunity to present all material pertinent to such a motion by Rule 56.

Summary Judgment is appropriate when the pleadings, responses to discovery, and the record reveal that no genuine issue of any material fact exists and that the moving party is entitled to judgment as a matter of law. *See* Rule 56(c) of the Federal Rules of Civil Procedure. The party moving for summary judgment has the initial burden of showing that no genuine issue of any material fact exists and that the moving party is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). After the moving party has met its burden, the non-moving party must come forward with specific facts showing that evidence exists to support its claims and that a genuine issue for trial exists. *Id.; Matsushita Electric Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *see* F.R.Civ.P. 56(e) (in response to motion for summary judgment, "adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial"). When considering motions for summary judgment, courts must view facts and inferences in the light most favorable to the party opposing the motion for summary judgment. *Matsushita*, 475 U.S. at 587–88, 106 S.Ct. at 1356; *United States v. Diebold, Inc.*, 369 U.S. 654, 655, 82 S.Ct. 993, 994, 8 L.Ed.2d 176 (1962). When, however, the evidence from the entire record could not lead a rational factfinder to find for the non-moving party, no genuine issue for trial exists and summary judgment is appropriate. *Matsushita*, 475 U.S. at 587, 106 S.Ct. at 1356.

The Court will grant the Defendant's Motion for Summary Judgment for the reasons set forth hereinafter.

### CONCLUSIONS OF LAW

I.  The "Individuals with Disabilities Education Act (IDEA)" was originally enacted as "Education of Handicapped Act (EHA)", Title 20, § 1400–1485.

The purpose of the Act as stated by Congress in § 1400(c) is stated as follows:

(c) **Purpose**

It is the purpose of this chapter to assure that all children with disabilities have

available to them, within the time periods specified in section 1412(2)(B) of this title, a free appropriate public education which emphasizes special education and related services designed to meet their unique needs, to assure that the rights of children with disabilities and their parents or guardians are protected, to assist States and localities to provide for the education of all children with disabilities, and to assess and assure the effectiveness of efforts to educate children with disabilities.

The Plaintiffs' complaint consists of a splendid display of vituperative allegations, strident rhetoric and unprofessional mischaracterizations of fact and law complaining of arbitrary implementation of acts "in secret," failure to accord "fundamental fairness and due process" "denied them a fair hearing and procedural due process," "arbitrary and conclusory decision" and so on *ad infinitum.* However, the complaint never mentions the "Individuals with Disabilities Education Act."

Title 20, § 1401(a)(16) provides:

(16) The term "special education" means specially designed instruction, at no cost to parents or guardians, to meet the unique needs of a child with a disability, including—

    (A) instruction conducted in the classroom, in the home, in hospitals and institutions, and in other settings; and

    (B) instruction in physical education.

Title 20, § 1401(a)(18) defines "free appropriate public education" (hereinafter "FAPE") as follows:

(18) The term "free appropriate public education" means special education and related services that—

    (A) have been provided at public expense, under public supervision and direction, and without charge,

    (B) meet the standards of the State educational agency,

    (C) include an appropriate preschool, elementary, or secondary school education in the State involved, and

    (D) are provided in conformity with the individualized education program required under section 1414(a)(5) of this title.

IDEA assists children with disabilities through the creation of IEPs, "individualized education programs," which are "tailored to the unique needs of the handicapped child." *Board of Education v. Rowley,* 458 U.S. 176, 181, 102 S.Ct. 3034, 3038, 73 L.Ed.2d 690 (1982); *See also David D. v. Dartmouth School Committee,* 775 F.2d 411 (1st Cir.1985), *cert. denied* 475 U.S. 1140, 106 S.Ct. 1790, 90 L.Ed.2d 336 (1986). The IEP requires a written statement for each child with a disability, developed in a meeting of parents, teachers, administrators and, whenever appropriate, such child. The statement must specify the present levels of educational performance of the child, specific educational services to be provided, a statement of the needed transition services and criteria for progress evaluation. 20 U.S.C. § 1401(20). The Act further requires at least an annual review of each child's IEP and authorizes revisions wherever appropriate. § 1413(a)(5); *See also* § 1413(a)(11).

If the parent or child believes that the IEP implemented by the school "provides a lesser education than they regard to be their legal right, or if they feel their procedural rights have been infringed, they have an opportunity for an initial impartial due process hearing conducted at the local or regional level. The party may then appeal to the state educational agency if dissatisfied by the findings of the local agency." § 1415(b)(2). If the party is aggrieved by the findings and decision of the state administrative hearing, the Act gives him the right to bring a civil action in federal or state court. § 1415(e)(2).

See *Chuhran v. Walled Lake Consol. Schools,* 839 F.Supp. 465 (E.D.Mich.1993).

The Defendant has moved for summary judgment as to the IDEA claims. In *Board of Education v. Rowley,* 458 U.S. 176, 206–208, 102 S.Ct. 3034, 3051–52, the Supreme Court set out a two part test for determining whether there has been compliance with IDEA as follows:

In suits brought under the Act's judicial-review provisions, a court must *first* deter-

mine whether the State has complied with the statutory procedures, and *second,* must then determine whether the individualized program developed through such procedures is reasonably calculated to enable the child to receive educational benefits. If these requirements are met, the State has complied with the obligations imposed by Congress and the courts can require no more.

So, the matter boils down to those two requirements.

The statutory procedures, Title 20, § 1415(b) are:

**(b) Required procedures; hearing**

(1) The procedures required by this section shall include, but shall not be limited to—

(A) an opportunity for the parents or guardian of a handicapped child to examine all relevant records with respect to the identification, evaluation, and educational placement of the child, and the provision of a free appropriate public education to such child, and to obtain an independent educational evaluation of the child;

. . . .

(C) written prior notice to the parents or guardian of the child whenever such agency or unit—

(i) proposes to initiate or change, or

(ii) refuses to initiate or change,

the identification, evaluation, or educational placement of the child or the provision of a free appropriate public education to the child;

(D) procedures designed to assure that the notice required by clause (C) fully informs the parents or guardian, in the parents' or guardian's native language, unless it clearly is not feasible to do so, of all procedures available pursuant to this section; and

(E) an opportunity to present complaints with respect to any matter relating to the identification, evaluation, or educational placement of the child, or

the provision of a free appropriate public education to such child.

The facts are:

Glen III was in possession of a gun clip loaded with live bullets while at school. (FF # 5).[3]

Glen III was removed from school by Defendant December 10, 1993. (FF # 6).

On December 10, 1993, June I was orally notified that Glen III had been suspended from school because he was in possession of a gun clip with live bullets, and on the same day Glen II was notified that Glen III had been suspended from school because he was in possession of a gun clip with live bullets. (FF # 7 & # 8).

On December 10, 1993, June I was orally notified that during the week of December 13, 1993, school personnel familiar with Glen III would be convened to consider the relationship between Glen III's behavior for which he was being suspended and his ADHD. (FF # 9).

If Glen III's possession of a gun clip and bullets on December 10, 1993 was not related to a manifestation of his ADHD, Glen III was subject to the disciplinary process applicable to "regular education" students, and even if it were related, Defendant was entitled to suspend Glen III from school for up to ten days. (FF # 13 & # 14).

On Monday, December 13, 1993, a school-based committee, which is a multi-disciplinary group of educators and specialists familiar with Glen III's disability and with his IEP met to consider whether Glen III's behavior in possessing a gun clip and bullets was related to his ADHD, and determined that his handicap was not related to his conduct. His parents, Glen II and June I, did not attend that meeting even though June I had been orally notified. (FF # 15, # 16, & # 9).

On December 14, 1993, Bryan Blavatt, Court Liaison Officer for CMS, wrote Glen II advising him of a hearing concerning Principal Joel Ritchie's request that Glen III be placed on ESS, advising Glen II of his rights at the hearing pursuant to Student Behavior Guidelines. (FF # 17).

---

**3.** "Finding of Fact" (FF).

At Glen II's request the ESS hearing was rescheduled for January 3, 1994, and Glen II was notified of the new hearing date by letter from Blavatt on December 17, 1993, advising Glen II of his right to representation, his right to question witnesses, and his right to present evidence on Glen III's behalf. (FF # 18).

On January 3, the meeting was held as scheduled and presided over by Bryan Blavatt to decide on whether Principal Joel Ritchie's recommendation to place Glen III on ESS would be implemented. The meeting was attended by Joel Ritchie, Assistant Principal Curtis Carroll, Glen II, June I, Robin Clarke, an assistant to Robin Clarke, C.M. Satterly, Irving Brenner, and Glen III. Testimony was heard by several witnesses, including the individuals in attendance and Glen III's sister, Stephanie. Glen II and June I and Glen III were given a full and fair opportunity to participate and they did participate in the hearing. (FF # 19).

Based on the evidence presented at the hearing (see FF # 20 & # 21), and after being informed by the Exceptional Children's Department of its review of the determination of the school-based committee that normal disciplinary procedures were applicable, Blavatt recommended that Glen II be transferred to the safety net program at the Management School, which recommendation was reviewed by the Assistant Superintendent for Student Services. (FF # 22).

On January 11, 1994, Blavatt wrote the parents of Glen III and advised them that Glen III was placed on ESS and that he had the right to remain in his same educational placement for services while at the Management School. The parents were also advised of their due process rights to appeal the suspension decision and they did appeal to the Charlotte–Mecklenburg Board of Education (CMBOE) which upheld the ESS. (FF # 23).

CMS developed the Management School in part to provide an environment where children with behavioral difficulties can continue their education and receive behavioral assistance to enable them to re-turn to their regular school assignment. They are required to remain at the Management School for a minimum of sixty days, after which students are periodically evaluated for return to their regular school assignments. The Management School consists primarily of students who have been reassigned from their regular school program. (FF # 24).

The Management School provides the standard regular and special educational curriculum offered at a typical CMS middle school, and also offers special behavior management technique. Students in the Management School usually benefit from the small class size and low student teacher ratio, which is lower than that found at regular CMS middle schools. (FF # 25).

The Management School is equipped to deal with exceptional children, and is fully capable of providing Glen III with the special education and related services he needs. The Management School was ready and able to provide services which comply with Glen III's IEP in January, 1994. (FF # 26). It had provided education and related services to students identified with ADHD prior to and during the 1993–94 school year. (FF # 37).

Assignment to the Management School was not a change in placement (FF # 38), and there is no evidence that the student population of the Management School in 1993–94 was predominantly composed of dangerous students and/or students who had criminal records. (FF # 39).

Plaintiffs agreed to the 1993–94 IEP (FF # 40) and it was Blavatt's professional opinion that at the time of placement of Glen III in January 1994, the Management School could have appropriately fulfilled Glen III's IEP. (FF # 27).

Glen III was reassigned to and could have attended the Management School for the balance of the 1993–94 school year, subsequent to the disciplinary hearing on January 3, 1994. (FF # 30).

However, Plaintiffs at no time enrolled or otherwise presented Glen III for attendance at the Management School during 1994. (FF # 31).

Plaintiffs received copies of their due process rights under federal and state law prior to the 1993–94 school year and were otherwise aware of their right to initiate a contested case hearing through the Office of Administrative Hearings at the time Glen III was reassigned to the Management School in 1994, and at the time CMS determined not to pay for Glen III at the Dore Academy for the 1994–95 school year. (FF # 33 & # 34).

CMS conducted IEP meetings for Glen III for the 1994–95 school year, and all persons requested by Plaintiffs to attend the IEP meetings for 1994–95 were present at the meetings. (FF # 44 & # 45).

Plaintiffs did not enroll or otherwise present Glen III for attendance at any CMS school for the school year 1994–95. (FF # 46).

Plaintiffs did not request an Administrative Placement Committee Meeting in response to the CMBOE attorney informing them of their right to do so by letter dated February 17, 1994. (FF # 49 & # 50).

Plaintiffs knew of their rights to pursue an administrative appeal of Glen III's suspension but did not pursue an administrative appeal of Glen III's suspension under N.C.G.S. § 115C. (FF # 51 & # 52).

In any event, Glen III enrolled at Eastway Middle School on February 28, 1995. He had attended Dore Academy at least part of the time he did not attend CMS from August 1994 through approximately January 1995. (FF # 55 & # 57).

In November 1994 CMS received a request from Glen II to meet and discuss the services at Eastway and the needs of Glen III. The meeting was held on November 15, 1994 at Eastway to review the services he was receiving at Dore Academy and those available at Eastway. The meeting was attended by Glen II, Mary Dore, Ph. D., resource teachers, principal and assistant principals, counsellors, etc. (FF # 56).

Thereafter Glen II requested that Glen III be enrolled in CMS and CMBOE made plans for the review of the agreed-to IEP for the 1993–94 school year and the development of an IEP for the present school year.

Another meeting was scheduled for January 26, 1995 but was cancelled at the request of Glen II. (FF # 57).

The initial IEP meeting was rescheduled by agreement to take place at Eastway on March 16, 1995 at 3:45 P.M. and again at that meeting Glen II, June I, and several psychologists, teachers, principal and assistant principals were present, referred to as the IEP team. Glen II agreed to the plan as developed on March 16, 1995. (FF # 59).

On April 4, 1995 a second IEP meeting was held at Eastway to finalize and sign the new IEP. The meeting was attended by Glen II and again teachers, principals, etc. (FF # 60).

As a result of the IEP conferences, a new IEP was prepared for Glen III which was signed by the IEP team as well as Glen II under which Glen III is currently receiving services at Eastway and is being implemented and all services are being delivered to Glen III. No complaints have been received from Glen III or his parents. (FF # 60 & # 61).

Congress has provided a procedure by which the Plaintiffs could have had an administrative resolution of their complaint against the Charlotte–Mecklenburg School Board of Education and that is the "Education of the Handicapped Act," now "Individuals with Disabilities Education Act", Title 20, Section 1400, *et. seq.* of the United States Code.

Title 20, Section 1415(f) provides:

**(f) Effect on other laws**

Nothing in this chapter shall be construed to restrict or limit the rights, procedures, and remedies available under the Constitution, title V of the Rehabilitation Act of 1973 [29 U.S.C.A. § 790 et seq.], or other Federal statutes protecting the rights of handicapped children and youth ... *except that before* the filing of a civil action under such laws seeking relief that is also available under this subchapter, the procedures under subsections (b)(2) and (c) of this section shall be *exhausted* to the same extent as would be required had the

action been brought under this subchapter. (Emphasis added).

Title 20, Sections 1415(b)(2) and (c) provide:

> (2) Whenever a complaint has been received under paragraph (1) of this subsection, the parents or guardian shall have an opportunity for an impartial due process hearing which shall be conducted by the State educational agency or by the local educational agency or intermediate educational unit, as determined by State law or by the State educational agency. No hearing conducted pursuant to the requirements of this paragraph shall be conducted by an employee of such agency or unit involved in the education or care of the child.

> **(c) Review of local decision by State educational agency**

> If the hearing required in paragraph (2) of subsection (b) of this section is conducted by a local educational agency or an intermediate educational unit, any party aggrieved by the findings and decision rendered in such a hearing may appeal to the State educational agency which shall conduct an impartial review of such hearing. The officer conducting such review shall make an independent decision upon completion of such review.

The N.C. State law governing appeal from the action of a local educational agency is N.C.Gen.Stat. § 115C–116 (Cum.Supp.1994) with administrative review pursuant to § 115C–116 (Cum.Supp.1994) to be initiated and conducted under the N.C. Administrative Procedure Act (NCAPA), N.C.Gen.Stat. § 150B. The NCAPA provides for a 60 day time limitation for filing of a petition for a contested case against the Defendant. N.C.Gen.Stat. § 150B–23(b) (1991).

The parents were notified in compliance with the Statute, the hearing was held in compliance with the Statute, Glen II was notified by letter from Mr. Middlebrooks, the Charlotte–Mecklenburg Board of Education (CMBOE) attorney, to the Plaintiffs' attorney, dated March 16, 1994 informing Glen II that the CMBOE had decided to uphold Glen III's external school suspension. (Glen II Depo., Vol. I, p. 165, 1. 14–25, p. 166, 1. 1–8; Depo. Ex. 23 & 24).

After he received the notice from Middlebrooks on or about March 16 or 17, 1994 of the Board's decision, Glen II did not appeal the CMBOE decision, even though he was represented by counsel during that period of time. (Depo. Glen II, Vol 1, p. 166, 1. 24–25; p. 167, 1. 1–18).

■ Instead of following the provisions of the Federal and State statutes, the Plaintiffs on April 12, 1994 filed a complaint in the General Court Division, State of North Carolina, Mecklenburg County, headed:

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF; DAMAGES; N.C. CONST. ARTICLE I, §§ 1, 15, 18, AND 19; N.C.GEN.STATU. CHAPTER 168 *ET SEQ.;* N.C.GEN. STAT. CHAPTER 168A *ET SEQ;* N.C.GEN.STAT. 7A–516 *ET SEQ.;* DEPRIVATION OF FEDERAL CIVIL RIGHTS (42 U.S.C. §§ 1983 AND 1988); DEPRIVATION OF RIGHTS UNDER THE REHABILITATION ACT, § 504 (29 U.S.C. 794 *ET SEQ.*); DEPRIVATION OF RIGHTS UNDER THE AMERICANS WITH DISABILITIES ACT, TITLE III (ADA § 302(b), 42 U.S.C. § 12182)
DEMAND FOR JURY TRIAL
N.C.CIV.P. RULE 38(b)

On motion of the Defendant, filed May 25, 1994, the action was removed to this Court.

It is noted that the complaint does not mention the Individuals with Disabilities Education Act (IDEA), Title 20, § 1480–1485.

**A.** ***Title 20, § 1415(b) through (e), "Individuals with Disabilities Education Act" (IDEA) (formally EHA) is the exclusive avenue through which the child and his parents or guardians can pursue their claim.***

In this case, we think Congress' intent is clear. Allowing a plaintiff to circumvent the EHA administrative remedies would be inconsistent with Congress' carefully tailored scheme. The legislative history gives no indication that Congress intended such a result. Rather, it indicates that Congress perceived the EHA as the most

effective vehicle for protecting the constitutional right of a handicapped child to a public education. We conclude, therefore, that where the EHA is available to a handicapped child asserting a right to a free appropriate public education, based either on the EHA or on the Equal Protection Clause of the Fourteenth Amendment, the EHA is the exclusive avenue through which the child and his parents or guardian can pursue their claim.

*Smith v. Robinson,* 468 U.S. 992, 1012, 104 S.Ct. 3457, 3469, 82 L.Ed.2d 746 (1984).

■ Title 20, § 1415(e)(3)(A) provides that during the proceedings conducted pursuant to this section the child shall remain in the then current educational placement of such child (the "stay put" provision). The Act does not define the phrase "change in placement" nor does the statute's structure or legislative history provide any guidance as to how the term applies to fixed suspensions. However, "where a student poses an immediate threat to the safety of others, officials may temporarily suspend him or her for up to 10 school days." *Honig v. Doe,* 484 U.S. 305, 325, 108 S.Ct. 592, 605, 98 L.Ed.2d 686 (1988) (see footnote 8).

Thus, the suspension of Glenn II on December 10, or December 13 for possession of a gun clip and bullets with the subsequent hearing scheduled December 17, 1993, and rescheduled at the request of Plaintiffs for January 3, 1994, did not violate the provisions of that section.

■ **B.** *Title 42, §§ 1983 and 1988 are not applicable.* The Plaintiffs have alleged various constitutional violations, both State and Federal and have attempted to employ § 1983 as the vehicle to seek redress for these violations. However, as previously shown, the Supreme Court has stated that the Individuals with Disabilities Education Act is the exclusive avenue through which the Plaintiffs can pursue their claim. *Smith v. Robinson, supra.*

In *Albright v. Oliver,* —— U.S. ——, ——, ——, 114 S.Ct. 807, 811, 812, 127 L.Ed.2d 114 (1994), the Supreme Court held:

Section 1983 "is not itself a source of substantive rights," but merely provides "a

method for vindicating federal rights elsewhere conferred." *Baker v. McCollan,* 443 U.S. 137, 144, n. 3, 99 S.Ct. 2689, 2694, n. 3, 61 L.Ed.2d 433 (1979). The first step in any such claim is to identify the specific constitutional right allegedly infringed. *Graham v. Connor,* 490 U.S. 386, 394, 109 S.Ct. 1865, 1870, 104 L.Ed.2d 443 (1989); and *Baker v. McCollan, supra,* 443 U.S., at 140, 99 S.Ct., at 2692.

Claims under 42 U.S.C. § 1983 are redundant and summary judgment will be granted as to those claims.

■ **C.** *The Rehabilitation Act, § 504 (29 U.S.C. § 794 et. seq.) is not available to Plaintiffs.*

Section 504, 29 U.S.C. § 794, provides in pertinent part:

**(a) Promulgation of rules and regulations.**

No otherwise qualified individual with a disability in the United States, ... of this title, shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be *subjected to discrimination* under any program or activity conducted by any Executive agency.... The head of each such agency shall promulgate such regulations as may be necessary to carry out the amendments to this section made by the Rehabilitation, Comprehensive Services, and Developmental Disabilities Act of 1978. Copies of any proposed regulation shall be submitted to appropriate authorizing committees of the Congress, and such regulation may take effect no earlier than the thirtieth day after the date on which such regulation is so submitted to such committees. (Emphasis added).

Section 504 prevents discrimination because of a handicap. IDEA on the other hand guarantees a free appropriate public education (FAPE). IDEA refers to handicapped *children.* Section 504 protects handicapped persons of all ages. IDEA is limited to handicapped children.

Section 504 does not require affirmative action on behalf of handicapped persons, but

only that they will not be discriminated against.

As stated by the Supreme Court in *Smith v. Robinson,* 468 U.S. 992, 1018–20, 104 S.Ct. 3457, 3472, 82 L.Ed.2d 746 (1984):

> There is no suggestion that § 504 adds anything to petitioners' substantive right to a free appropriate public education. The only elements added by § 504 are the possibility of circumventing EHA administrative procedures and going straight to court with a § 504 claim, the possibility of a damages award in cases where no such award is available under the EHA, and attorney's fees. As discussed above, Congress' intent to place on local and state educational agencies the responsibility for determining the most appropriate educational plan for a handicapped child is clear. To the extent § 504 otherwise would allow a plaintiff to circumvent that state procedure, we are satisfied, that the remedy conflicts with Congress' intent in the EHA.

The Court will grant summary judgment as to Plaintiffs' claim pursuant to the Rehabilitation Act of 1973, § 504.

### ■ D. *The Americans with Disabilities Act, Title III ADA, § 302(b), 42 U.S.C. § 12182, is not applicable.*

Once again, the Plaintiffs have chosen to proceed under an antidiscrimination statute rather than proceeding under the one statute Congress has provided as the exclusive avenue to proceed on Plaintiffs' claims.

Children with disabilities are provided for in IDEA. See 20 U.S.C. § 1400(c).

The Plaintiffs also once again are attempting to circumvent the procedural requirements of IDEA, and summary judgment for the Defendant will be granted. See 42 U.S.C. § 12182(a), (b).

### ■ E. *The Plaintiffs do not state a claim based on state law or the N.C. Constitution.*

The Plaintiffs have offered no evidence as a violation of any North Carolina statute or the North Carolina Constitution. This is a case where the Plaintiff Glen III admitted in his deposition that he had a gun clip with live

bullets in school on December 10, 1993, and further admitted that he didn't tell the "whole story when he was testifying at the hearing in January 1994 concerning his ESS." (Glen III Depo. pp. 86–90, 106–108).

As a result of that and several other behavioral incidents (see Glen II Depo.), Glen III was assigned to Management School, which Glen II admits could accommodate Glen III's needs. Glen III was subsequently absent from school during 1994, (FF 27–31), and did not attend Management School. Management School was not a change in placement. (FF 38). Glen III did not attend Management School because "me and my father talked it over, and we both decided that it wouldn't be a good place for me to go." (Glen III Depo., p. 111, 1. 7–16). (FF 29). The Plaintiffs did not discuss this with either Dr. Lesser or Ms. Clarke. (Glen III Depo., p. 111, 1. 17–23).

The Court will grant the Defendant's Motion for Summary Judgment on the state claims.

### II. The Plaintiffs have not complied with the time limitations for administrative remedies.

■ Title 20 U.S.C. § 1415(e)(2) defers to state law and North Carolina law and North Carolina law provides for administrative review of an action of a local school board regarding educational placement. N.C.Gen. Stat. § 115C–116 (Cum.Supp.1994). The administrative review is to be initiated and conducted under the N.C. Administrative Procedure Act (NCAPA), N.C.Gen.Stat. § 150B, N.C.Gen.Stat. § 115c–116(d). The NCAPA provides a 60–day limitation for the filing of a petition for a contested case against a local school board. N.C.Gen.Stat. § 150B–23(b) (1991).

As the 7th Circuit held in *Family & Children's Center v. School City,* 13 F.3d 1052, 1056 (7th Cir.1994):

> Finally, the IDEA provides a right of action in federal district court, 20 U.S.C. § 1415(e), *but only after a prospective plaintiff has exhausted state administrative remedies. See Doe By and Through Doe v. Smith,* 879 F.2d 1340 (6th Cir.1989),

*cert. denied,* 493 U.S. 1025, 110 S.Ct. 730, 107 L.Ed.2d 749 (1990). (Emphasis added).

Plaintiffs have not to this date filed a petition for a contested case. Thus, since the time limit has expired, the Plaintiffs have abandoned the process and sought relief in the courts without exhausting the available administrative remedies and are therefore barred from seeking relief in this Court.

One further matter before this Court which will be addressed is the failure of Robin B. Clarke, the Plaintiffs' "Advocate" who was subpoenaed by the Defendant, to be present for a deposition at 9:00 a.m. May 24, 1995 at the office of Defendant's counsel.

A copy of the subpoena was served upon her personally at her home on April 21, 1995, according to fn. 1 in Defendant's Supplemental Memorandum filed September 8, 1995. Further, according to that footnote, Ms. Clarke did not attempt to quash the subpoena but called the office of Defendant's attorneys on May 23, 1995 as a "courtesy" to advise counsel she would not appear for her deposition. No excuse was given. In view of her refusal to honor the subpoena the Court will strike all her testimony or other evidence from her from the record and will not consider it for any purpose.

Further, at a later time, the Court will probably issue a show cause order to Ms. Clarke to appear before this Court and explain why she should not be held in contempt.

### CONCLUSION

The Plaintiffs in this case were given every opportunity by the Defendant school which was afforded to them by the law to appear at hearings and state their contentions. They have failed to follow the procedures of which they were admittedly aware, and have not exhausted their administrative remedies. The State has complied with the statutory procedures; the individualized program was developed through those procedures, has been agreed to by all parties, and the IEP has been implemented.

**NOW, THEREFORE, IT IS ORDERED** that the Defendant's Motion for Summary Judgment (document # 41) is **GRANTED** as to all the Plaintiffs' claims as follows:

1. First Claim—State Constitutional Rights
2. Second Claim—Statutory Juvenile Rights—Neglect and Dependency
3. Third Claim—State Statutory Handicapped Person Protection Rights
4. Fourth Claim—Federal Constitutional Civil Rights
5. Fifth Claim—Federal Statutory Civil Rights, Title 42 U.S.C. § 1983
6. Sixth Claim—Federal Statutory Rehabilitation Act Rights, Title 29 U.S.C. § 794 *et. seq.*
7. Seventh Claim—Federal Statutory Americans with Disabilities Act, Title 42 U.S.C. § 12182.
8. The Motion for Mandatory Preliminary Injunction (document # 5) is **DENIED as moot.**

A Judgment will be filed simultaneously with this Memorandum of Decision and Order.